UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CALVITA FREDERICK ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 C 342 |
| ) | |
| RICHARD EASTY and ALL UNKNOWN ) | |
| OWNERS, ) | |
| ) | Judge Rebecca R. Pallmeyer |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This case stems from a failed real estate transaction. In June 2013, Defendant Richard Easty sold a home to Plaintiff Calvita Frederick for cash, and then allowed her to move in prior to the closing. Ms. Frederick, an attorney, assured Mr. Easty she was about to recover a substantial fee—but the money never materialized and the closing never happened. Instead, Frederick paid use and occupancy charges for a brief period, but then remained in the home for several more months. Ultimately, Easty was required to repair to the state courts to evict her. In the meantime, Frederick appears to have concluded that the best defense is an offense to the judicial system: she sued Easty in this court, alleging violations of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and common law fraud. Her claims are objectively groundless, and Easty is entitled to summary judgment [16, 21]. For the reasons explained here, his motion for Rule 11 sanctions [33] must be granted, as well.

## BACKGROUND

**I.      The Property Sale**

Plaintiff Calvita Frederick, an African American woman, is an attorney licensed to practice law in Illinois. (Pl.'s Resp. [44-1] to Def.'s Stat. of Mat. Facts [23], herein "Def.'s 56.1,"

¶ 1.)  Defendant Richard Easty lives in Oak Park, Illinois.[1]  (*Id.* ¶ 2.)  Easty at one time owned a single family residential home (the "Property") in Oak Park.  (*Id.* ¶ 4.)  The Property, built in 1893, was designed by Frank Lloyd Wright and is sometimes called the "Thomas Gale House."  (*Id.*)

Frederick and Easty first discussed a potential sale of the Property in March 2013.  (Def.'s Resp. [56] to Pl.'s Stat. of Mat. Facts [47], herein "Pl.'s 56.1," ¶¶ 1–3.)  Easty told Frederick that he had owned the property for "approximately six years" but that he had tired of being a landlord, so he was selling the Property and several others that he owned.  (Def.'s Resp. to Pl.'s 56.1 ¶ 2.)  At least initially, the parties disagreed over the Property's value.  Easty suggested that it was worth close to $1 million, while Frederick believed the value was closer to $300,000.  (*Id.* ¶ 4.)  The basis for Frederick's valuation was a report from an on-line website, but Easty discounted the website's valuations as being "notoriously unreliable."  (*Id.*)  Despite the initial spread between the parties' positions, Frederick asked Easty to keep her abreast of any other offers he received so she could consider submitting a competing bid.  (Def.'s Resp. to Pl.'s 56.1 ¶ 6.)  Frederick did not have the cash necessary to buy the house but asserted that she "had several matters in the works" related to her law practice that might generate the necessary funds.  (Def.'s Resp. to Pl.'s 56.1 ¶ 5.)  In her complaint, Frederick repeats this sentiment: she alleges she "repeatedly indicated to Defendant that she did not have the funds to purchase the premises readily available, but expected the settlement of a legal matter she was handling would provide the funds for her to purchase the premises in the near future."  (First Am. Compl. ¶ 12.)  Easty maintains that Frederick told him that she had "won a seven figure

---

[1] Frederick also names "All Unknown Owners" as defendants.  (*See* First Am. Compl. [11], Caption.)  There is no evidence that anyone other than Easty owned the property at issue during the relevant time period, nor has Frederick explained how any unknown persons have violated her civil rights or defrauded her.  The court dismisses "All Unknown Owners" as parties.  *See* FED. R. CIV. P. 21 ("[T]he court may at any time, on just terms, add or drop a party.").

case," expected to receive the funds "any day," and would then have the money she needed to purchase the Property. (Def.'s Resp. to Pl.'s 56.1 ¶ 5.)

In late May 2013, Easty received another offer for the Property and contacted Frederick, as she had requested. (*Id.* ¶ 6.) Frederick responded on May 22, making a competing offer of $800,000 in an e-mail. (*Id.*) Easty responded the following day, notifying Frederick that her offer was "essentially the same" as the other one he received and that he would give her a chance to improve it before he made a decision. (*Id.* ¶ 7.) Frederick alleges that, in fact, "Easty did not have any other offers at the time in April, May or June of 2013 and was instead, requiring Frederick to bid against herself." (Pl.'s 56.1 ¶ 8; First Am. Compl. ¶¶ 68–69.) Frederick offers no evidence in support of this contention, however. Easty, for his part, submitted to the court a copy of a written offer in the amount of $825,000 from a third party, along with copies of e-mail correspondence concerning the offer with the third-party's attorney. (*See* John Harris E-mails & Proposed Contract, Exs. A–B to Easty Supp. Aff. [54-2].) The third-party sweetened his offer a few days later, ultimately offering $836,000 on May 28. (*See* John Harris E-Mails, Ex. A to Easty Supp. Aff.)

Also on May 28, Frederick presented Easty with a written offer to purchase the Property for $822,000 in cash. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 5–6.) In his affidavit, Easty explained that even though Frederick offered less for the Property, he accepted her proposal because she was offering to pay cash and to close in just two weeks (on June 11). (Easty Supp. Aff. ¶ 13.) The third party's offer was contingent on obtaining mortgage financing and would not close until July 25. (*Id.*) On May 28, 2013, Easty signed and accepted Frederick's offer; the signed purchase contract reflects that the parties agreed to a closing "ASAP, approximately June 11, 2013." (*Id.* ¶¶ 5–6; *see* Purchase Contract, Ex. A to Easty Aff. [16-1].)

Shortly after the parties signed the contract, Frederick told Easty that she would not have the money to close by June 11. (Pl.'s Resp. to Def.'s 56.1 ¶ 8.) She asked Easty to allow her to take possession before the closing, and Easty agreed. (*Id.* ¶ 9.) According to Frederick,

3

Easty did not ask why she wanted to move in before closing, and she did not give him an explanation. (Pl.'s 56.1 ¶ 10.) In Easty's account, he agreed to the proposal because Frederick had told him that she had to move out of her previous residence, that her personal property was "already on the truck," and that she expected to have the funds "in a week." (Def.'s Resp. to Pl.'s 56.1 ¶ 10; Def.'s 56.1 ¶ 8.) Easty's attorney drafted a document called "Possession Agreement," setting forth terms on which Frederick would be permitted to move into the Property prior to closing. (*Id.* ¶ 9; Ex. B to Easty Aff., hereinafter "Possession Agreement.") That document, which both parties signed on June 12, included the following terms:

- The parties agreed to close the sale of the Property on June 26, 2013.
- Frederick agreed to pay Easty $200 per day in "use and occupancy" charges, totaling $2,800.00 in payments (from June 12 until June 26).
- Frederick agreed to pay all utilities for the Property beginning June 12, 2013.
- At closing, all prorations for rents, taxes, utilities, fees, and other costs associated with property ownership would be calculated as of June 12, 2013.
- Frederick agreed to "be solely responsible for insuring her property."
- Frederick agreed to inspect the Property and to accept it "in the condition it is in when she takes possession and will not delay closing because of the condition of the [Property]."
- Frederick agreed that taking early possession "does not create a tenancy and agrees to vacate the [Property] immediately upon election of Seller in the event the closing does not take place."
- Frederick agreed to "indemnify and hold [Easty] harmless" for lawsuits and other liabilities and expenses "arising out of [Frederick's] possession of the [Property] prior to closing."

(Possession Agreement ¶¶ 1–6.) But the closing did not occur on June 26, presumably because Frederick did not have money to pay the purchase price. (Pl.'s Resp. to Def.'s 56.1 ¶ 12.) Easty again agreed to extend the closing date, this time to July 10, on the condition that Frederick pay the $200 per day use and occupancy charges in advance. (Pl.'s Resp. to Def.'s 56.1 ¶ 12.) Frederick paid $2,800 in use and occupancy charges on July 4, 2013, covering the payments through July 10. (*Id.*) The closing did not occur on that date, either, however, and Frederick made no more use and occupancy payments for the remainder of July. (*Id.* ¶ 13.)

4

On July 14, 2013, Easty's attorney, Gregory Melnyk, scheduled a closing to take place on July 24, 2013 at Prairie Title Services in Oak Park, Illinois. Melnyk sent an e-mail to Frederick's real estate attorney, Glenda Gray, informing her of the July 24 date. (Def.'s 56.1 ¶ 13.) Frederick denies a closing was scheduled for July 24 and appears to have attempted to reschedule the closing for July 30 or 31. (Pl.'s Resp. to Def.'s 56.1 ¶ 13; Gray E-mails to Melnyk, Ex. M to Frederick Aff. [48-12].) Melnyk himself did show up at Prairie Title for the July 24 closing, but neither Frederick nor Gray appeared. (Def.'s 56.1 ¶ 14.) That same day, Melnyk sent a letter to Gray declaring that Frederick was in default of the May 28 purchase contract and demanding possession of the Property. (Melnyk Letter, Ex. C to Easty Aff.)

Frederick did not surrender possession, and the pattern of aborted closings, followed by new negotiations, continued for a short while longer. Sometime in mid-August 2013, Easty gave Frederick one last chance to close on the Property; he warned, though, that if the closing did not occur by September 3, he would place the Property back on the market. (Pl.'s Resp. to Def.'s 56.1 ¶ 15.) Easty also asked Frederick to move out of the Property immediately unless Frederick became current with her daily use and occupancy payments. (*Id.*) Frederick paid Easty $12,000 on or around September 3, which covered the charges through September 7, 2013. (*Id.*) The deal did not close on September 3, and on September 10, Easty told Frederick the Property was back on the market. (*Id.* ¶¶ 15–16.) Frederick's response was to send an e-mail message to Easty on September 12, attaching a document captioned "Right to Purchase Agreement" (*id.* ¶ 17), purportedly to "extend the time within which Frederick can purchase the [Property] from Easty on or before November 30, 2013." (Right to Purchase Agreement, Ex. E to Easty Aff.) In a series of e-mails, the parties discussed this proposed new agreement. One of its more important provisions was that Frederick would pay Easty $40,000 as a non-refundable, earnest money payment, forfeited if the parties did not close by November 30. (*See* Easty/Frederick September 2013 E-mails, Ex. D to Easty Aff.) The parties dispute whether the

5

$40,000 was due on September 16, the day that Frederick signed the agreement and sent it to Easty, but it is undisputed that she did not pay it. (*See* Pl.'s Resp. to Def.'s 56.1 ¶¶ 17–18.)

Easty did not sign the Right to Purchase Agreement with Frederick. (*Id.* ¶ 19.) Instead, on September 18, he entered into a new contract to sell the Property, this time to Michael and Carol Jago, for $905,000. (*Id.* ¶ 20.) Then on October 1, Easty e-mailed Frederick concerning several issues that Easty stated "must be addressed immediately." (Easty/Frederick E-mails October 2013, Ex. G to Easty Aff.) These included (a) that Frederick was behind on her use and occupancy payments; (b) that Frederick would not be permitted to remain on the Property past November 16; (c) that if Frederick did stay past November 16, Easty intended to charge her $500 per day; and (d) that Easty needed to access the Property to "follow up on a few items brought up in the home inspection" conducted in anticipation of the Jagos' purchase. (*See id.*) Frederick responded by saying that she had "agreed" to move out of the property during the last week of November; she asserted that being asked to move sooner was "unexpected" and that "it may take [her] a moment to put [her] plan in place." (*Id.*) A week later, on October 8, Easty served Frederick a "Notice of Termination," demanding possession of the Property within ten days of the date of service. (Notice of Termination, Ex. H to Easty Aff.) The Notice stated that Frederick had "breached the terms of the Possession Agreement by failing to close[.]" (*Id.*)

On October 18, Easty filed an eviction suit against Frederick in the Circuit Court of Cook County, but Frederick successfully moved to dismiss the case on the ground that Easty had filed his complaint before expiration of the 10-day notice period on the Notice of Termination. (Pl.'s Resp. to Def.'s 56.1 ¶ 24.) Easty filed a second eviction action against Frederick on January 2, 2014. (*Id.* ¶ 25.) Frederick demanded and received a trial by jury. (*Id.*) On May 2, 2014, a jury awarded Easty $26,000 in damages and possession of the Property with a stay of execution until May 30, 2014. (*Id.*) In response to the verdict, Frederick assured the presiding judge that she would vacate the Property within 28 days; perhaps not surprisingly, she did not do so. (*Id.* ¶ 27.) An eviction order was placed with the Cook County Sheriff on July 14, 2014. (Def.'s Rule

11 Motion [33], 14 n.2.) The eviction could not proceed, though, until Easty sought and obtained relief from the automatic stay in Frederick's new Chapter 13 bankruptcy case, which she had filed on August 7. Frederick finally surrendered the Property to Easty on August 29, 2014. (*See id.*; Receipt and Surrender of Possession, Ex. H to Frederick Aff. [48-7].) She has paid Easty no use and occupancy charges since September 2013. (Def.'s Rule 11 Mot. at 14 n.2.)

Though Frederick lived in the property rent-free for nearly a year, she makes sundry allegations about duties she claimed Easty owed her during that period but purportedly failed to carry out. For instance, according to Frederick, Easty "shut off or caused the water service to be shut off" at the Property in January 2014. (Pl.'s 56.1 ¶ 22.) Easty denies this and claims he received notice from the Village of Oak Park that the water was being shut off because Frederick had not paid the water bill. (Def.'s Resp. to Pl.'s 56.1 ¶ 22.) Frederick also alleges that Easty made numerous repairs in September 2013 in anticipation of selling the Property to new buyers that he did not perform for Frederick. (First Am. Compl. ¶ 17.) Easty claims that he did not make any repairs because Frederick refused him access, and that to the extent he agreed to make repairs for the Jagos, it was because they paid a higher purchase price. (Def.'s 56.1 ¶ 23; Def.'s Mem. in Supp. of Sum. Judg. [24], hereinafter "Def.'s Mem.," 10.) Frederick asserts that she paid to replace the water heater after she moved in and paid various landscaping and snow removal charges. (*See* Pl.'s 56.1 ¶¶ 11–12; First Am. Compl. ¶¶ 24–25, 30.) In response, Easty simply cites the Possession Agreement, which placed these responsibilities on Frederick herself. (*See* Possession Agreement ¶¶ 2–3; Def.'s Mem. at 9–10.)

## II.     Prior Court Proceedings and Procedural History

In this lawsuit, Frederick contends it was she who has been wronged, specifically by purported violations of the Fair Housing Act and by fraud. This is not her first such assertion: in 2011, she sued a mortgage company, its servicer, and the company's attorneys in this court,

alleging violations of the Fair Housing Act and the Civil Rights Act in response to a foreclosure action on a home Frederick owned at 4753 South Dorchester, Chicago, Illinois. (Pl.'s Resp. to Def.'s 56.1 ¶ 30 (citing *Frederick v. Select Portfolio*, 07-cv-7044, 2011 WL 1444075 (N.D. Ill. April 14, 2011).) In that case, the court granted summary judgment to defendants because, among other things, Frederick had failed to respond to the summary judgment motion at all or submit a Local Rule 56.1 statement. *Frederick*, 2011 WL 1444075 at *3. From the time the mortgage company first attempted to foreclose on the Dorchester home in 2003 until 2012 when litigation between the parties ceased, Frederick filed three separate Chapter 13 bankruptcy petitions, all of which were dismissed for various reasons. (*See* Pl.'s Resp. to Def.'s 56.1 ¶¶ 33–38.)

Frederick filed the current lawsuit on January 17, 2014. The court struck Frederick's initial complaint *sua sponte*, noting that while Frederick was representing herself, she was still a licensed attorney, and the complaint in its original form did not provide sufficient detail of any alleged harm she suffered. (*See* May 9, 2014 Order [10], 1–2.) Frederick filed an amended complaint on May 29, 2014. (*See* First Am. Compl.) The court set an initial status hearing for June 27. Frederick failed to appear, but Easty's counsel reported that he had served her with a Rule 11 warning on June 5, advising that Easty would seek sanctions if she failed to withdraw her pleading. (*See* June 27, 2014 Minute Entry [15].) There was no response, and Easty filed his motion for summary judgment on July 11. At a second status hearing on July 16, Frederick appeared and requested 28 days to respond to Easty's summary judgment motion. The court granted that request. (*See* July 16, 2014 Minute Entry [26].)

On August 14, the day Frederick's response was due, she filed a motion to voluntarily dismiss the current action, or alternatively for an extension of time to file her response. (*See* Mot. to Dismiss [27].) The court denied Frederick's motion because Easty had filed a motion of summary judgment and intended to seek sanctions, making dismissal without an award of costs inappropriate. (*See* August 19, 2014 Minute Entry [31].) The court then stayed the case

8

pending resolution of another Chapter 13 bankruptcy petition Frederick filed on August 7, 2014. (*Id.*) Because the Chapter 13 case was filed within a year of a dismissal of a prior Chapter 13 case, the automatic stay imposed under bankruptcy law would terminate in 30 days unless extended by the bankruptcy court. *See* 11 U.S.C. § 362(c)(3)(A)–(B). On September 5, 2014, in her bankruptcy case (*In re Calvita Frederick*, No. 14-29045, Bankr. N.D. Ill. 2014). Frederick filed a motion to extend the automatic stay. Easty's counsel appeared and opposed the motion, and after an evidentiary hearing, the bankruptcy court extended the stay against all creditors *except* Easty and permitted litigation involving Frederick and Easty to proceed. (*See* Def.'s Mot. for Hearing on Sum. Judg. [32], ¶ 5.)

On September 11, Easty filed his motion for sanctions pursuant to Rule 11. (Def.'s Rule 11 Mot.) The court directed Frederick to respond to the motions for summary judgment and for sanctions on October 16. When October 16 came, however, Frederick again sought an extension of time. (*See* Pl.'s Mot. for Extension of Time [37].) Observing that Frederick "effectively granted her own continuance by waiting until the date the brief was due to file a request for additional time," the court granted her an extension until October 31 but warned her that no further extensions would be given. (October 21, 2014 Minute Entry [41].) Frederick did submit part of her briefing on October 31, but then asked the court a few days later for leave to file amended responses, albeit after she had already filed the amended responses. (*See* Docs. 42, 44–48.) The amended responses included a more thorough response to Easty's motion for summary judgment and provided citations to legal authorities. The court granted the motion. (*See* November 12, 2014 Minute Entry [58].)

## **DISCUSSION**

The court will grant a motion for summary judgment when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The court "construe[s] all facts and draw[s] reasonable inferences in the light most favorable to the

nonmoving party." *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). The court will grant summary judgment against a party that does not produce evidence that would allow a reasonable jury to find in its favor on a material question. *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted). Conclusory allegations of discrimination therefore cannot defeat a summary judgment motion. *See Fischer v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998).

Frederick brings two claims under the Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601 *et seq*. The court has federal question jurisdiction over these claims, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over the remaining state law fraud claim pursuant to 28 U.S.C. § 1367. Frederick seeks recovery for economic, personal injury, and punitive damages, attorneys' fees and costs, and pre- and post-judgment interest. (*Id.* ¶¶ 53–57, 62–66, Prayer for Relief c-d, f.) She also seeks declaratory and injunctive relief. (*Id.* at Prayer for Relief, a, e.)

Easty moves for summary judgment on all claims against him. In addition, Easty has filed a Rule 11 motion against Frederick and seeks attorneys' fees and costs associated with litigating this case. The court rules on the summary judgment motion before discussing whether sanctions are appropriate.

**I.      42 U.S.C. § 3604(b)**

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b). The FHA applies to conduct that takes place both before and after a tenant or owner has acquired a property interest in a home. *See Bloch v. Frischholz*, 587 F.3d 771, 780–82 (7th Cir. 2009) (en banc). Section 3604(b), however, does not provide a "blanket 'privilege' to be free from all discrimination from any source" and was not intended to make "quarrels between

10

neighbors a routine basis for federal litigation." *Id.* at 780 (quoting *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 338 F.3d 327, 329 (7th Cir. 2004) (internal ellipsis omitted).

A plaintiff can prove discrimination under § 3604(b) either by showing that a defendant had a discriminatory intent when making a particular housing decision, or that the defendant's decision had a discriminatory effect or disparate impact on a protected class. *See South-Suburban Housing Ctr v. Greater South Suburban Board of Realtors*, 935 F.2d 868, 882 (7th Cir. 1991). Frederick relies on discriminatory effect and disparate impact allegations but makes no specific disparate impact arguments. (*See* Pl.'s Resp. to Def.'s Mot. [46], 1.) To establish discriminatory effect, Frederick must show (1) that she is a member of a protected class; (2) that she was qualified to receive the services in question (i.e., to purchase or rent the Property); (3) that she was denied such services by Easty; and (4) that Easty treated a similarly situated person who was not a member of a protected class more favorably. *See Krieman v. Crystal Lake Apts. Ltd. Partnership*, No. 05-cv-0348, 2006 WL 1519320, *7 (N.D. Ill. May 31, 2006).

### A.     Count I:  Rental of Dwelling

In Count I, Frederick claims that Easty violated the FHA when he

> required Frederick to pay much more to rent the dwelling than previous non-black tenants had paid; required Frederick to pay for the replacement of the hot water heater in the premises, required Frederick to pay certain utilities including the water bill for the premises; failed and refused to provide necessary maintenance and repairs to the rental home; required Frederick to pay for Easty's homeowner's insurance for the premises and his private residence; terminated the water service to the premises; and required Frederick to pay for landscaping and snow removal for the premises, all based upon Frederick's race and/or sex.

(First Am. Compl. ¶ 51.) She further alleges that

> Easty's prior tenants who were not African American and female were not required to; pay $6,000.00 per month for rent; pay for the replacement of hot water heaters; pay for the water service to the premises; make and/or pay for their own maintenance and repairs; pay Easty's home owner's insurance; live without water for over four days; and pay for landscaping and snow removal.

(*Id.* ¶ 52.) None of Frederick's arguments have basis in law or fact, and the court grants summary judgment to Easty on Count I.

First, Frederick argues that Easty violated § 3604(b) by requiring her to pay "much more" to rent the dwelling than previous, non-African American tenants had paid. (Pl.'s Resp. at 1; First Am. Compl. ¶ 51.) In her Local Rule 56.1 Statement, she alleges, without factual support, that "Easty did not require his previous tenant, a Caucasian male[,] to . . . pay $6,000.00 per month for rent." (Pl.'s Add'l Stat. of Mat. Facts [44-2], ¶ 21.) Her affidavit submitted in response to Easty's motion for summary judgment contains the same allegation (Pl.'s Aff. in Opp. to Def.'s Mot. for Sum. Judg. [44-3], ¶ 17), but is similarly lacking in any factual foundation. Frederick presumably calculates the $6,000 per month "rental" charge by multiplying the $200 use and occupancy daily fee she agreed to pay in order to move into the Property prior to closing. (*See* Possession Agreement ¶ 2.) Without endorsing Frederick's assumption that a landlord's charging higher rent to a new tenant reflects unfair treatment, the court observes that the Possession Agreement did not create a $6,000 month-to-month lease of the Property. Instead, the Agreement required her to pay $2,800 for the 14 days from the date she took possession (June 12) until the closing date set for two weeks later. To underscore that this was a daily use charge, not a rent payment, the Possession Agreement expressly states that "[Frederick] agrees that this early possession does not create a tenancy[.]" (*See id.* ¶ 6.) The use and occupancy charge for moving in prior to closing on the Property created an entirely different set of legal entitlements than a 12-month lease for the Property. Frederick cannot establish that she was similarly situated to any other renter, and Count I fails for this reason alone. *Cf. Sheikh v. Rabin*, Nos. 13–2294, 13–3552, 565 Fed. Appx. 512, 516 (7th Cir. 2014) (unpublished) (in attempting to prove disparate impact FHA claim, plaintiff must produce evidence that "other applications [for zoning variances] involved properties and variance requests that are "identical or directly comparable in all material respects" to satisfy the similarly situated requirement).

Moreover, Easty submitted evidence that further defeats the notion that previous renters were similarly situated to Frederick. In his supplemental affidavit, Easty produced the actual leases he had with prior tenants. (*See* Residential Leases, Exs. G & H to Easty Supp. Aff.) While those prior tenants paid only $5,000 and $4,500 in rent, they had long-term lease agreements with Easty; there was no understanding that they would be purchasing the Property within two weeks. In contrast, in exchange for allowing Frederick to assume possession of the Property (which she did not own) prior to closing, Easty requested, and Frederick agreed, to assume certain obligations attendant to property ownership in anticipation of closing. The Possession Agreement was not a lease—it was a pre-closing arrangement negotiated between the parties. She therefore cannot establish that the prior tenants were similarly situated but treated more favorably, much less establish that the reason for favorable treatment was *because* the prior tenants were male, or Caucasian, or both. *See* 42 U.S.C. § 3604(b).

Next, Frederick argues that Easty discriminated against her by requiring her to pay utilities, such as the water bill, and by requiring her to obtain homeowner's insurance. (First Am. Compl. ¶ 51; Pl.'s Resp. at 1–2.) But Frederick *agreed* to undertake these obligations as part of the Possession Agreement and has not suggested the transaction was conducted other than at arms' length. (*See* Possession Agreement ¶¶ 2–3 ("[Frederick] shall pay all utilities commencing June 12, 2013."); ("[Frederick] shall be solely responsible for insuring her property."); ("[Frederick] shall maintain liability insurance naming [Easty] as an additional insured.").) Frederick is a licensed attorney and is presumed to understand contract law. These allegations do not suggest discriminatory treatment toward her in the "sale or rental of a dwelling."

Frederick also alleges that she was treated differently from prior tenants because Easty canceled water service to the property, required her to replace the water heater, and required her to pay for landscaping and snow removal. (First. Am. Compl. ¶ 51.) Here again, Frederick's claims lack factual support. Under the terms of the Possession Agreement, "[Frederick]

13

agree[d] . . . to accept the Premises in the condition it is in when she takes possession and will not delay closing because of the condition of the Premises." (Possession Agreement, ¶ 2.) In other words, it was Frederick's burden to replace the water heater after she moved into the Property. As for landscaping and snow removal, Easty has shown that his previous tenants were also required to pay those costs. (*See* Residential Leases, Exs. G–H to Easty Supp. Aff.) The parties to this case dispute whether they were ever in a landlord-tenant relationship (*see* Def.'s Reply in Supp. of Sum. Judg. [54], 6–8), but even if this dispute were resolved in Frederick's favor, her claim of disparate treatment with respect to these maintenance costs would fail on its merits.

In short, the record contains no evidence to suggest that Easty took any discriminatory action against Frederick because Frederick was African American or female. Frederick's § 3604(b) rental claim fails as a matter of law.

### B. Count II: Sale of Dwelling

In Count II, Plaintiff alleges Easty violated the FHA in connection with the sale of a property and asserts the same allegations as Count I. She further asserts that Easty made the necessary repairs requested by a subsequent white buyer but not the repairs she requested. (*Id.* ¶ 61.)

Easty is entitled to summary judgment on this count as well. The court begins with Frederick's contention that she was required to pay more for the Property than a white purchaser. (First Am. Compl. ¶ 61.) She identifies the white purchaser as simply "Michael _____." (*Id.*) "Michael _____" is in fact Michael Jago, and Easty submitted evidence that his contract to purchase the property was for $905,000, or $83,000 *more* than Frederick agreed to pay. (*See* Pl.'s Resp. to Def.'s 56.1 ¶ 19.) Frederick's allegation is simply false. Elsewhere Frederick alleges that Easty made repairs for Mr. Jago but not her. (First Am. Compl. ¶ 61.) That would matter in the context of an FHA housing discrimination claim only if she and Mr. Jago were similarly situated. But they weren't. Mr. Jago (and his wife, though Frederick's

allegations ignore her) paid a higher purchase price, which was presumably negotiated in exchange for Easty's agreement to make various repairs. And Frederick promised, in the Possession Agreement, "to accept the Premises in the condition it is in when she takes possession and will not delay closing because of the condition of the Premises." (Possession Agreement ¶ 2.) When she accepted the conditions as-is, Frederick forfeited any claim that she was entitled to repairs. For these reasons, as well as the reasons discussed in Part II.A, the court grants summary judgment to Easty on Count II.[2]

### III. Count III: Fraud or Misrepresentation

The court has granted summary judgment to Easty on Frederick's FHA claims, so only her state law claim for fraud remains. In its discretion, the court exercises supplemental jurisdiction over it. *See* 28 U.S.C. § 1367; *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). To prove fraud under Illinois law, "a plaintiff must show that the defendant made a knowingly false representation of a material fact. The plaintiff must also show that she reasonably relied on the false representation to her detriment." *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 536 (7th Cir. 2011) (applying Illinois law).

Frederick's fraud claim rests on allegations that Easty falsely represented to her that he had other written offers for the Property at a price equal or higher to the price she had offered in late May 2013. (*See* Pl.'s 56.1 ¶ 8; First Am. Compl. ¶ 68.) She claims that in reliance on these

---

[2] While not pleaded as a separate count, Frederick also invokes 42 U.S.C. § 3617 (First Am. Compl. ¶ 65), which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . a right granted by [§ 3604(b)]." The claim is frivolous. Frederick had a contractual obligation to vacate the Property if she failed to close. She had no "right" to enjoy the Property after defaulting on the agreement. And assuming she did, her allegations that Easty shut off the water and electricity or entered the Property without notice do not state a claim for relief because Frederick does not produce any evidence that any of these actions were taken because she was African American or female.

misrepresentations, she was damaged because she "agreed to pay Easty an amount in excess of the actual value of the property." (First Am. Compl. ¶ 73.) The claim fails as a matter of law.

Proof of damage resulting from the alleged fraud or deceit is an essential element in an action for fraud or deceit. *Estate of Davis*, 633 F.3d at 537. Even assuming that Frederick agreed to pay a price greater than the actual value of the Property, and assuming that such an agreement is evidence of fraud, Frederick suffered no damage because she never paid the purchase price. Further, Easty has produced an actual proposed offer from at least one third-party who did offer $836,000 for the Property on May 23, 2013, which is $14,000 *more* than Frederick offered to pay on May 22, 2013. (*See* Harris E-mails and Proposed Contract, Exs. A–B to Easty Supp. Aff.) More than a year later, on October 30, 2014, the Jagos purchased the Property from Easty for $905,000. (Jago Contract, Ex. E to Easty Supp. Aff.) There is simply no factual support for the suggestion that the price Frederick agreed to (but never did) pay ($822,000) was "an amount in excess of the actual value of the property." Easty is entitled to summary judgment on Count III.

## IV. Sanctions

In his brief, Easty invokes 42 U.S.C. § 3613(c)(2), which states that "[i]n a civil action under subsection (a) of this section, a court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs." A defendant may recover under section 3613(c)(2) only if the plaintiff's suit was "vexatious, frivolous, or brought to harass or embarrass the defendant." *Claiborne v. Wisdom*, 414 F.3d 715, 720 (7th Cir. 2005) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 n.2 (1983)). Easty also invokes Rule 11 and 28 U.S.C. § 1927[3] as separate bases to recover attorneys' fees from Frederick. *Cf. Claiborne*, 414 F.3d at

---

[3] Section 1927 states: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

721 (noting that Rule 11 allows a court to sanction an attorney and award attorneys' fees). The court will proceed in its analysis under Rule 11.

Rule 11(c)(2) provides that a motion for sanctions must be served on the opposing party and cannot be filed with a court until 21 days have passed from the date of service. The 21-day window provides a "safe harbor" to the alleged offending party to withdraw or correct the challenged pleading. *Matrix IV, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 649 F.3d 539, 552 (7th Cir. 2011). The notice "must 'describe the specific conduct that is alleged to violate Rule 11(b).'" *Id.* at 552 n.5 (quoting *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1012 (7th Cir. 2004)). The letter that counsel sent to Frederick on June 5, 2014 satisfies this standard. (*See* Safe Harbor Letter, Ex. 2 [33-1] to Def.'s Rule 11 Mot.) The letter details the lack of factual bases for any of Frederick's claims in this litigation and explains the multiple arguments Easty would make in seeking sanctions against Frederick. The grounds for Rule 11 sanctions that Easty laid out in his letter are identical to those he has presented in this motion. (*See generally* Rule 11 Mot.) Such a letter is sufficient for Rule 11 purposes. *See Matrix IV, Inc.*, 649 F.3d at 552.

When filing any pleading with the court, under Rule 11, a party certifies both that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and that "the factual contentions have" or "will likely have evidentiary support." FED. R. CIV. P. 11(b)(2), (3). "[A] frivolous argument is simply one that is baseless or made without a reasonable and competent inquiry." *Berwick Grain Co., Inc. v. Ill. Dep't of Ag.*, 217 F.3d 502, 504 (7th Cir. 2000) (internal quotations and citation omitted). Rule 11 is also violated when a party signs a paper that is presented for an improper purpose, such as to harass opponents or cause needless increase in the cost of litigation. *See* FED. R. CIV. P. 11(b)(1) and (2); *Burda v. M. Ecker Co.*, 2 F.3d 769, 773–74 (7th Cir. 1993). To find a Rule 11 violation, a court must make an objective inquiry to determine whether the petitioner "should have [known] that his

position is groundless." *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7*, 821 F.2d 390, 397 (7th Cir.1987). If a court finds a Rule 11 violation, it may impose a sanction that includes directives of a non-monetary nature and an order to pay some or all of the reasonable attorney fees and other expenses incurred as a direct result of the violation. FED. R. CIV. P. 11(c)(2).

Sanctions are appropriate in this case. First, Frederick's amended complaint included several factual contentions that were baseless at the time they were made. *See Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1014 (7th Cir. 2004) ("The focus in Rule 11 sanctions is on what counsel knew at the time the complaint was filed[.]"). Frederick alleged that Easty made numerous demands, such as requiring Frederick to acquire insurance, pay for landscaping, utilities, home repairs, and that he did so based on Frederick's race and sex. (*See* First Am. Compl. ¶ 51.) What Frederick failed to do was attach a copy of the Possession Agreement to her complaint. The Agreement eviscerates Frederick's claims of disparate treatment under the FHA because in it, Frederick *agreed* to undertake these obligations in exchange for moving into the Property prior to closing. Failing to reconcile the Possession Agreement with her allegations in the complaint is inexcusable.

Second, in Count II, Frederick alleges that Easty required Frederick to pay more to purchase the Property than the Jagos paid, months later; and that Easty made repairs for Mr. Jago based on a home inspection but did not make similar repairs for Frederick. (First Am. Compl. ¶ 61.) That paragraph contains two factual allegations—one of them false, and the other objectively misleading. Easty produced evidence that the Jagos in fact paid $905,000, or $83,000 more to purchase the property than Frederick. And Frederick agreed to accept the Property as-is, while the Jagos negotiated for repairs in exchange for a higher purchase price. (*See* Def.'s 56.1 ¶ 19; Def.'s Mem. at 10.) Frederick also alleges that Easty entered into the contract with Mr. Jago while Easty and Frederick were still under an agreement to sell the Property to Frederick. (First Am. Compl. ¶ 32.) This allegation, too, is false: Frederick knew at

the time she filed her amended complaint that Easty's counsel had declared her contract terminated on July 25, 2013; she also knew that Easty had rejected her counter-offer in September 2013 and placed the home back on the market. (*See* Pl.'s Resp. to Def.'s 56.1 ¶¶ 14, 16, 19.) Frederick is charged with alleging factual contentions that "have evidentiary support," FED. R. CIV. P. 11(b)(3), and she did not do so in this case.

Third, the court notes that Frederick has brought a Fair Housing claim. The Fair Housing Act is designed "to ensure that no one is denied the right to live where they choose for discriminatory reasons." *Bloch*, 587 F.3d at 776. Setting aside the factual deficiencies in her complaint, Frederick's allegations, taken together, do not come close to clearing the nonfrivolous bar under Rule 11(b)(2). Easty made the property available to Frederick and did not require a down payment. He allowed her to move into the Property prior to closing and continued to work with her to extend the closing date, relying on her representations that she would be able to present the funds. That never happened, but Frederick remained on the property, rent free, for a year. Her claims of race and sex discrimination are frivolous and had no legal basis at the time she brought them. *See Berwick Grain Co., Inc.*, 217 F.3d at 504; FED. R. CIV. P. RULE 11(b)(2).[4]

Fourth, the court concludes that this lawsuit was presented for the improper purpose of causing unnecessary delay and needlessly increasing the cost of litigation. *See* FED. R. CIV. P. 11(b)(1). At the time Frederick sued Easty, in January 2014, the parties had nothing left to negotiate regarding the Property. Their last discussions had ended months earlier, and by this point Easty was in the process of attempting to evict Frederick so he could prepare the Property to sell to a different party. Instead of vacating the Property, proceeding to closing, or even paying use and occupancy charges, Frederick filed this baseless lawsuit. She then failed to

---

[4] Frederick is a licensed attorney acting as a *pro se* litigant in this matter. As such, Rule 11(c)(5), which provides that a court "must not impose a monetary sanction against a represented party for violating Rule 11(b)(2)," does not apply in this case.

appear at the first status hearing held on April 16, 2014. (*See* April 16, 2014 Minute Entry [5].) On the day Frederick's response to Easty's motion for summary judgment was due, she asked to dismiss the case without costs, or alternatively, for an extension of time to file a response. The court denied her motion, but the case was stayed anyway because Frederick had filed a Chapter 13 bankruptcy petition. After the bankruptcy stay was lifted, this court set a new deadline for briefs to be submitted. On that day, Frederick again sought an extension, which the court reluctantly granted. (*See* Oct. 21, 2014 Minute Entry.) Finally, Frederick submitted her responses on the due date, but then unilaterally filed amended responses several days later. Frederick's conduct has forced Easty to spend resources countering not only her baseless federal and state claims, but also her efforts to quietly drop the case without an award of costs. Frederick's conduct in submitting deficient pleadings to the court was pervasive and caused such unnecessary delay and expense as to justify sanctions in this case.

## **CONCLUSION**

Easty's motion for summary judgment on all claims is granted [16, 21]. The court also grants Easty's Rule 11 motion [33] and orders Frederick to pay Easty all attorneys' fees and costs associated with litigating this lawsuit in an amount to be determined by this court at a later date. The parties are directed to adhere to procedure outlined in this court's Local Rule 54.3. The court understands that any judgment rendered here will have to pass through Frederick's bankruptcy case, if it is still active, before Easty can collect. *See In re Calvita Frederick*, No. 14-29045 (Bankr. N.D. Ill. 2014).

ENTER:

Date: February 11, 2015

REBECCA R. PALLMEYER
United States District Judge